UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CHINYERE OGHIDE,

<table>
<tr><td></td><td>Plaintiff,</td><td>**OPINION AND ORDER**</td></tr>
<tr><td>-against-</td><td></td><td>24 Civ. 00232 (JCM)</td></tr>
</table>

DOUGLAS A. COLLINS, Secretary, Department
of Veterans Affairs,

Defendant.
-------------------------------------------------------------X

Plaintiff Chinyere Oghide ("Plaintiff") brings this action pursuant to Title VII of the Civil

Rights Act of 1964 ("Title VII") against Douglas A. Collins ("Defendant"),[1] Secretary of the

United States Department of Veterans Affairs (the "VA"), alleging employment discrimination

based on race, sex, and national origin; retaliation; and hostile work environment. (Docket No.

1).  Before the Court is Defendant's motion for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure. (Docket No. 52).  Plaintiff opposed Defendant's motion,

(Docket No. 70), and Defendant replied, (Docket No. 69).  For the reasons that follow,

Defendant's motion is granted in part and denied in part.[2]

## I.  BACKGROUND

The following facts are taken from Defendant's Statement of Material Facts submitted

pursuant to Local Civil Rule 56.1 of the United States District Courts for the Southern and

Eastern Districts of New York ("Def. 56.1"), (Docket No. 54), Plaintiff's Response to

---

[1] Douglas A. Collins ("Defendant"), Secretary of the United States Department of Veterans Affairs (the "VA"), is substituted for former Secretary Denis McDonough as the defendant in this action, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] This action is before the Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket No. 33).

Defendant's Rule 56.1 Statement, (Docket No. 72), and the affidavits and exhibits submitted by the parties in support thereof.[3]  Plaintiff's Response to Defendant's Rule 56.1 Statement, (*id.*), is comprised of two sections—Plaintiff's response to Defendant's statement of facts ("Pl. 56.1 Resp.") and Plaintiff's own statement of facts ("PSF").  To the extent that Plaintiff's own statement of facts "goes beyond responding to Defendant's 56.1 Statement and/or setting out allegedly disputed issues, [it] is not authorized" under Local Civil Rule 56.1. *Dale v. Suffern Cent. Sch. Dist.*, 18 Civ. 4432 (AEK), 2023 WL 6386808, at *1 (S.D.N.Y. Sept. 28, 2023).  "There is no provision for a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment simply thinks are important; any additional facts should be confined to material facts in dispute." *Ostreicher v. Chase Bank USA*, *N.A.*, No. 19-CV-8175 (CS), 2020 WL 6809059, at *1 n.1 (S.D.N.Y. Nov. 19, 2020).  Since Plaintiff's own statement of facts does not comply with the Local Rules, the Court "has opted to conduct an 'assiduous review of the record' for purposes of deciding the instant motion." *Dale*, 2023 WL 6386808, at *1 (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)).  Any disputes of material fact are noted.

## A.  Factual Background

Plaintiff, a Black woman from Nigeria, began working as a registered nurse ("RN") in 1994. (Docket No. 58-1).  Plaintiff continued her education, earning her adult nurse practitioner ("NP") license, master's degree in nursing, and Doctor of Nursing Practice ("DNP"). (*Id.*).  As an RN, Plaintiff worked in several different units and facilities in New York, including nursing homes, medical surgical units, intensive care units, organ transplant units, and an emergency

---

[3] Specifically, the VA submitted declarations and accompanying exhibits from its attorney, Mollie Kornreich, (Docket No. 58); Hudson Valley Healthcare System's ("HVHCS") Julia Gawlik, (Docket No. 57); HVHCS's Dr. Michael Dolamore, (Docket No. 56); and HVHCS's Dr. Felix Kunjukutty, (Docket No. 55).  In opposition, Plaintiff filed a declaration and accompanying exhibits from her attorney, Tae Hoon Yang. (Docket No. 71).

department. (*Id.*).  As an NP, Plaintiff worked in primary care, internal medicine, elderly care, and rehabilitation. (*Id.*).

## 1. Employment With the VA

From January 2012 to August 2015, Plaintiff worked as an NP in the Community Living Center ("CLC") of Hudson Valley Healthcare System ("HVHCS"). (Pl. Tr. at 31:11-20).[4]  In August 2015, Plaintiff transferred to the compensation and pension unit ("C&P"), where her supervisor was Dr. Felix Kunjukutty. (*Id.* at 31:21-34:8).  In December 2015, Plaintiff transferred to the urgent care unit—where her supervisor was Dr. Regina Sexton—but continued working two days per week with C&P. (*Id.* at 34:9-36:15).

Plaintiff alleges there were several instances in 2015 and 2016 when Dr. Kunjukutty caused her to feel uncomfortable. (*Id.* at 130:18-134:8).  These instances include Dr. Kunjukutty calling Plaintiff to his office and looking at her in a sexual manner. (*Id.* at 131:14-24).  When Plaintiff told Dr. Kunjukutty that she was married and that it was "against [her] culture" for her to be with other men, Dr. Kunjukutty allegedly laughed and asked, "It's against your culture?" (*Id.* at 130:18-131:11).  Additionally, Plaintiff alleges that Dr. Kunjukutty followed her toward the bathroom and told her that he had been looking for her. (*Id.* at 132:6-21).  Plaintiff asked Dr. Kunjukutty to stop following her, and he replied that he was simply trying to "cover [her] behind" because the hospital was trying to contact her. (*Id.*).  Plaintiff also contends that Dr. Kunjukutty mimicked her Nigerian accent. (*Id.* at 133:3-7).[5]

---

[4] "Pl. Tr." refers to the transcript of Plaintiff's December 11, 2024 deposition. (*See* excerpts at Docket Nos. 58-3; 70-1).  The Pl. Tr. citations herein refer to the pagination of the original transcript.

[5] Defendant's 56.1 Statement does not specifically address the aforementioned allegations against Dr. Kunjukutty. However, Defendant argues that there is no evidence to support these conclusory references to harassment except Plaintiff's own deposition testimony, which is insufficient to defeat summary judgment. (Docket No. 69 at 7-8).

Further, Plaintiff alleges that Dr. Kunjukutty delayed granting Plaintiff's leave requests. (*Id.* at 43:15-44:19).  Specifically, on March 31, 2016, Plaintiff submitted time off requests for July, but Dr. Kunjukutty did not act on them until after she followed up with him on May 12, 2016. (Docket No. 70-9).  However, he had approved other employees' requested time off through September. (*Id.*).

## 2.  Plaintiff's Work Performance

Plaintiff's work performance was rated satisfactory or above throughout her tenure at HVHCS.  In her 2015 performance evaluation, she received "Outstanding" and "High Satisfactory" ratings. (Docket No. 70-8).  Similarly, Plaintiff's March 2017 Proficiency Report rated her as "High Satisfactory" and stated that Plaintiff was "very competent in handling and diagnosing a variety of patients in urgent care . . . . Her clinical skills are very high which is shown in, and not limited to[,] her quick decision making capacity." (Docket No. 70-10).  Plaintiff's November 2017 Proficiency Report rated her as "High Satisfactory," and her 2019 Proficiency Report stated that Plaintiff was "very competent in handling and diagnosing a variety of patients in urgent care, and functions independently.  She comfortably stabilizes, discharges, admits or transfer[s] patients to a higher level of care." (Docket Nos. 70-11; 70-12).

In Plaintiff's May 2020 Proficiency Report, Dr. Sexton gave her ratings of "Outstanding" and "High Satisfactory," and stated that she was "very competent in handling and diagnosing a variety of patients in urgent care . . . . [Plaintiff's] confidence in her practice as a provider in Urgent Care improves every year." (Docket No. 70-13).  Dr. Sexton again rated Plaintiff as "High Satisfactory" in her 2021 Proficiency Report and stated: "As a nurse, [Plaintiff] provides appropriate care plans . . . by assessing, evaluating, diagnosing, and treatment of the residents in the center." (Docket No. 70-20).  Plaintiff's final Proficiency Report in 2022 rated her as

"Satisfactory," and stated that Plaintiff "demonstrated her ability to interact fervently with the nurses, the veterans, and with their families . . . [and] is empathetic, modeling the spirit of the VA." (Docket No. 70-32).

### 3. NNEI Scholarship

The VA awards National Nursing Education Initiative ("NNEI") scholarships through the Employee Incentive Scholarship Program. (Pl. 56.1 Resp. ¶ 44). In 2019, Plaintiff received an NNEI scholarship. (*Id.*). Under the terms of the scholarship ("Scholarship Agreement"), (Docket No. 70-44), the VA agreed to pay Plaintiff's tuition for her DNP program, and, in return, Plaintiff agreed to work for the VA for a Service Obligation Period ("SOP") of three years. (Pl. 56.1 Resp. ¶ 45). The Scholarship Agreement specified that Plaintiff's three-year "SOP shall be completed in a full-time position as a: Registered Nurse – 0610 (Nurse Practitioner – NP)."[6] (*Id.* ¶ 46).

### 4. Plaintiff's First EEO Complaint

On October 21, 2020, a patient came to the urgent care unit complaining of chest pain. (*Id.* ¶ 3). Plaintiff placed an EKG order for another nurse to complete. (*Id.*). Plaintiff reviewed the patient's lab results and found an abnormality in the patient's bloodwork. (*Id.*). Plaintiff also realized that the nurse did not complete the EKG as ordered. (*Id.*). Plaintiff told the nurse that she needed to complete the EKG, discussed the patient's lab results with Dr. Sexton, and called the cardiologist. (*Id.*).

Because the EKG was improperly delayed ("EKG incident"), Plaintiff was placed on a ninety-day Focused Professional Practice Evaluation ("FPPE"). (*Id.*). Dr. Sexton testified that she was "pretty sure" that Dr. Kunjukutty told her to place Plaintiff on an FPPE. (Docket No. 70-

---

[6] The 0610 code referenced in the Scholarship Agreement is an occupational code at the VA which encompasses a range of registered nursing positions, from a staff nurse to a nurse practitioner. (Pl. 56.1 Resp. ¶ 47).

4 at 6).[7]  Thereafter, Plaintiff requested a transfer. (Pl. 56.1 Resp. ¶ 6).  Dr. Kunjukutty asked

Plaintiff to put her transfer request in writing, which she did via e-mail on October 30, 2020.

(Docket No. 56-1).

As chair of the Professional Standards Board ("PSB"), Dr. Kunjukutty evaluated the

EKG incident and placed Plaintiff on an FPPE because there was a delay in treatment and the

cardiologist reviewed the EKG instead of Plaintiff. (Kunjukutty Tr. at 42:5-44:25).[8]  Plaintiff

believed that Dr. Kunjukutty was disciplining her because she was Black. (Pl. Tr. 66:2-15).

Thereafter, Plaintiff contacted the Office of Resolution Management ("ORM") and the VA's

Equal Employment Opportunity office ("EEO") to file a complaint alleging that Dr. Kunjukutty

discriminated and retaliated against her. (Pl. 56.1 Resp. ¶ 4).

In November 2020, the parties engaged in mediation and reached a settlement, which

Plaintiff signed on December 10, 2020 ("Settlement Agreement"). (Docket No. 58-4).  In the

Settlement Agreement, the VA agreed that Plaintiff's FPPE would end on December 13, 2020,

and Plaintiff would be reassigned to a different department. (*Id.* at 1-2).  The Settlement

Agreement specifically stated that neither party admitted "guilt, liability, wrongdoing, or

violation of any federal or state statute or regulation." (*Id.* at 2).  Under the Settlement

Agreement, Plaintiff agreed to "settle[], waive[], withdraw[], and forever discharge[] the

Agency, it's past and present administrators or employees . . . from any and all complaints,

claims, grievances, appeals, expenses, and damages of any kind, which are or may be asserted by

[Plaintiff] or on [Plaintiff's] behalf, based on any event occurring before [Plaintiff's] execution

of this Agreement." (*Id.* at 1).  In addition, if Plaintiff believed that the VA was in breach of the

---

[7] All page number citations herein refer to the page number assigned upon electronic filing unless otherwise noted.

[8] "Kunjukutty Tr." refers to the transcript of Dr. Kunjukutty's November 26, 2024 deposition. (*See* excerpts at Docket Nos. 58-5; 70-3).  The Kunjukutty Tr. citations herein refer to the pagination of the original transcript.

Settlement Agreement, Plaintiff was required to "notify the Deputy Assistant Secretary for Resolution Management (ORM) in writing, within 30 calendar days after the date of the alleged breach." (*Id.* at 2).

### 5. Reassignment to the COVID Unit

In January 2021, Plaintiff was temporarily assigned to work in the COVID testing unit. (Pl. 56.1 Resp. ¶ 12). Plaintiff was concerned that her assignment to the COVID unit would violate her obligation to be in an NP position pursuant to the NNEI Scholarship Agreement. (Pl. Tr. at 80:3-25). In a meeting with Drs. Hall and Dolamore, Plaintiff expressed her dissatisfaction with the assignment. (Docket No. 70-22).[9] Dr. Hall told her that if she refused the assignment in the COVID unit, there would be no position for her with the VA, and she would need to resign. (*Id.*). On February 3, 2021, Plaintiff e-mailed Drs. Kunjukutty, Hall, Dolamore and Sexton to inform them that, while she was not refusing to accept her assignment to the COVID unit, she was requesting that her assignment be changed to the occupational health unit. (Docket No. 70-24). Plaintiff worked in the COVID unit until March 1, 2021. (Pl. 56.1 Resp. ¶ 14).

### 6. Transfer to the Occupational Health Unit

In March 2021, as the demand for COVID testing decreased, Plaintiff was given the option to be transferred to the administrative medicine program or the hospitalist program. (*Id.* ¶ 13). Plaintiff selected the administrative medicine program and was transferred to the occupational health unit within that program, per her request. (*Id.* ¶¶ 13-14).

In her new role, Plaintiff required modified privileges and additional training. (*Id.* ¶ 16). As a result, Plaintiff was placed on an FPPE. (*Id.*). This FPPE was pursuant to the VA's typical administrative process to place all providers on an FPPE when a transfer between units results in

---

[9] Plaintiff's dissatisfaction with this assignment is set forth in Dr. Dolamore's January 22, 2021 memorandum memorializing their meeting. (Docket No. 70-22).

a modification of the provider's privileges. (*Id.* ¶¶ 16-17).  Typically, this type of FPPE lasts for ninety days. (*Id.* ¶ 18).  Plaintiff's clinical reviewer was Dr. Kunjukutty, who initially extended Plaintiff's FPPE through June 21, 2021. (*Id.* ¶¶ 20-22).

Dr. Saxena supervised Plaintiff in the occupational health unit. (*Id.* ¶ 15).  However, Plaintiff alleges that Dr. Kunjukutty instructed Sidney Wallin, a physician assistant, to oversee Plaintiff's work and review Plaintiff's clinical notes. (*Id.* ¶ 25; Pl. Tr. at 116:16-117:9).  Plaintiff questioned the need for Ms. Wallin to review her notes, as such oversight is not typical between a physician assistant and an NP. (Pl. Tr. at 111:3-117:9).  Plaintiff maintains that Dr. Kunjukutty responded that if she did not complete her FPPE, her "privileges would be reduced or [she] would be stripped of [her] privileges," for which he would "report [her], then [she] will lose her license." (*Id.* at 125:13-25).  Although Defendant neither confirms nor denies that Dr. Kunjukutty's said this, the parties do not dispute "[i]f an employee fails to demonstrate competence in an FPPE, this could lead to a reduction in privileges, under which in some circumstance the VA is required to report to the National Practitioner Data Bank and relevant state professional licensing boards." (Pl. 56.1 Resp. ¶ 19).  Additionally, Dr. Kunjukutty explained that Ms. Wallin did not evaluate Plaintiff, but he did ask Ms. Wallin "to help Ms. Oghide when Ms. Oghide started in occupational health so that she would have [someone] to ask questions to if [he] wasn't available, and to be able to divide up the workload and learn the work flow of the clinic." (Kunjukutty Tr. at 109:16-21).

Dr. Kunjukutty extended Plaintiff's FPPE two more times until February 22, 2022. (Pl. 56.1 Resp. ¶ 22).  Plaintiff felt Dr. Kunjukutty was extending her FPPE based on "trivial" concerns, such as "failing to recommend optional vaccinations to patients." (*Id.*).[10]

---

[10] Plaintiff also alleges that during a meeting on February 22, 2022, Dr. Kunjukutty told Plaintiff she could file an EEO complaint against him after she asked why he was discriminating against her and subjecting her to a hostile

### 7. Seeking an Additional Transfer

On September 30, 2021, Plaintiff informed Dr. Kunjukutty that she was interested in applying for an NP position in the CLC, HVHCS's nursing home facility. (Docket No. 70-31). Plaintiff applied and was interviewed by three doctors, including Dr. Dolamore, who was head of the CLC. (Pl. 56.1 Resp. ¶¶ 27-29). After Plaintiff's interview, Dr. Dolamore discussed Plaintiff's application with Drs. Kunjukutty and Hall. (*Id.* ¶ 32). Dr. Hall told Dr. Dolamore that he had concerns regarding whether it was safe to have Plaintiff work in the urgent care unit given his assessment of previous care Plaintiff provided. (*Id.*). Drs. Kunjukutty and Hall also informed Dr. Dolamore that Plaintiff previously filed an EEO complaint against Dr. Kunjukutty. (*Id.*). Dr. Kunjukutty also forwarded to Dr. Dolamore Plaintiff's October 30, 2020 e-mail where she requested a transfer out of the urgent care unit because of the EKG incident. (*Id.* ¶ 33; Docket No. 56-1).

Ultimately, Dr. Dolamore did not select Plaintiff for the position. (Pl. 56.1 Resp. ¶ 35). Plaintiff alleges that Drs. Hall and Kunjukutty influenced Dr. Dolamore's decision not to select her. (*Id.* ¶¶ 28, 35). According to Dr. Kunjukutty, Plaintiff was not selected for the position because Plaintiff had previously requested to transfer out of the urgent care unit and had expressed concerns that she would not be able to provide care for cardiac emergencies. (Kunjukutty Tr. at 98:18-99:2). The applicant Dr. Dolamore selected, a Black woman, declined the position, so the VA had to repost the position. (Pl. 56.1 Resp. ¶ 36).

### 8. New RN Position and Second EEO Claim

On March 16, 2022, after learning that she was not selected for the NP position in the

---

workplace environment. (PSF ¶ 53; Docket No. 58-12 at 4). Defendant's 56.1 Statement does not address the alleged February 22, 2022 meeting. Moreover, there is nothing in the record to support Plaintiff's account of events beyond her own self-serving statements.

CLC, Plaintiff contacted an EEO counselor. (*Id.* ¶ 55).  On April 29, 2022, Plaintiff filed a formal discrimination complaint with the ORM. (*Id.* ¶ 56).

On July 26, 2022, the ORM issued a decision characterizing Plaintiff's complaint as involving a hostile work environment claim beginning January 20, 2021, and discrimination claims relating to three acts: (1) Plaintiff's non-selection for the CLC position in early 2022; (2) Dr. Kunjukutty's initial refusal to release Plaintiff from his department in March 2022; and (3) Plaintiff's alleged constructive demotion when she accepted an RN position because she was allegedly experiencing a hostile work environment. (*Id.* ¶ 57).  The ORM deemed Plaintiff's other claims untimely or deficient. (*Id.*).

Plaintiff requested a hearing before an EEO administrative judge and moved to reinstate claims that the ORM had not accepted for investigation. (*Id.* ¶ 58).  The administrative judge denied the motion, so Plaintiff requested a final agency decision. (*Id.*).  In or around March 2022, Plaintiff accepted an RN position at HVHCS with an occupational code of 0610. (*Id.* ¶ 43).

### 9.  Notice of Indebtedness and Third EEO Claim

As part of an annual review, an interim scholarship coordinator flagged that Plaintiff's RN position breached her NNEI Scholarship Agreement. (*Id.* ¶¶ 49-50).  On October 6, 2022, a coordinator alerted Dr. Kunjukutty and HVHCS's Beverly Duncklee that Plaintiff was in breach because she was no longer in an NP position. (Docket No. 70-39).  A new scholarship coordinator, who began in November 2022, reviewed Plaintiff's Scholarship Agreement and made a final determination that Plaintiff was in breach. (Pl. 56.1 Resp. ¶ 51).  On March 6, 2023, the VA sent Plaintiff a letter ("Notice of Indebtedness"), stating that Plaintiff breached her scholarship agreement and owed the VA $38,028.45. (Docket No. 70-40).

On or around April 20, 2023, Plaintiff contacted an EEO counselor regarding the Notice of Indebtedness. (Pl. 56.1 Resp. ¶ 59).  She filed a formal complaint of discrimination on or around June 9, 2023. (*Id.*).  On October 13, 2023, the ORM dismissed the complaint for failure to state a claim. (*Id.* ¶ 60).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A genuine dispute of material fact "exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).  "A fact is material if it might affect the outcome of the suit under the governing law." *Lindsay v. Ass'n of Prof'l Flight Attendants*, 581 F.3d 47, 50 (2d Cir. 2009).

In reviewing a motion for summary judgment, courts must draw all reasonable inferences in favor of the non-moving party, *see Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994), and "must disregard all evidence favorable to the moving party that the jury is not required to believe," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (internal citations omitted).  However, courts may not weigh the evidence or determine the truth of the matter, but rather must conduct "the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.

The moving party bears the initial burden of "demonstrating the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  The moving party may meet its burden of proof simply by pointing to the

absence of evidence to support an essential element of the plaintiff's claim. *See Tenay v. Culinary Teachers Ass'n of Hyde Park*, 281 F. App'x 11, 12-13 (2d Cir. 2008) (summary order) ("[T]he moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.") (citation and internal quotations omitted). Therefore, Defendant may meet its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case," but need not "raise a *prima facie* case." *Hughes v. U.S.*, No. 12 Civ. 5109 (CM), 2014 WL 929837, at \*4 (S.D.N.Y. Mar. 7, 2014) (quoting *Celotex*, 477 U.S. at 325).

If the movant meets this initial burden, the burden shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb*, 521 F.3d at 137. Like the movant, the non-movant cannot rely on allegations in the pleadings and must point to specific evidence in the record to establish that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. Summary judgment cannot be defeated by conclusory allegations or "on the basis of conjecture or surmise." *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992). The non-moving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998). Put differently, the dispute of fact must be "genuine," that is, the record evidence must be such that a reasonable jury could return a verdict for the non-movant. *See Anderson*, 477 U.S. at 248.

In the Southern District of New York, the party moving for summary judgment must submit a short and concise statement of material facts it contends are undisputed, supported by evidence that would be admissible at trial. Local Civ. R. 56.1. The party opposing summary judgment must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of the motion. Local Civ. R. 56.1(c);

*T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."). However, "uncontested fact[s] cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement"—in the absence of citations or "where the cited materials do not support the factual assertions in the [s]tatements." *Holtz*, 258 F.3d at 73 (citations and internal quotations omitted), *abrogated on other grounds by Moll v. Telesector Res. Grp.*, Inc., 94 F.4th 218 (2d Cir. 2024*)*. Furthermore, the Court is "not required to consider what the parties fail to point out." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (citations and internal quotations omitted).

## III. DISCUSSION

Congress amended Title VII in 1972 to bring "federal employees under [its] protection." *Colon v. U.S. Postal Serv.*, 95 F. Supp. 2d 85, 86-87 (D. Conn. 1999); *see also Brown v. General Serv. Admin.*, 425 U.S. 820, 825 (1976). Today, "Title VII is the exclusive remedy for a federal employee suing for employment discrimination." *Mitchell v. Chao*, 358 F. Supp. 2d 106, 111 (N.D.N.Y. 2005). Pursuant to 42 U.S.C. § 2000e-16(a), Title VII establishes that for federal employees "[a]ll personnel actions . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."

### A. Conduct Prior to the Settlement Agreement

As an initial matter, the VA argues that the Court should dismiss any claims predicated on conduct that occurred before December 10, 2020, the date Plaintiff signed the Settlement Agreement. (Docket No. 53 at 16). In response, Plaintiff explains that she is not asserting independent claims based on pre-Settlement Agreement conduct, but maintains that the evidence of what occurred during this time is essential background that demonstrates the discriminatory

- 13 -

and retaliatory animus motivating the VA's post-Settlement Agreement actions. (Docket No. 70 at 14-16).  Specifically, Plaintiff asserts that the VA retaliated against her by making adverse employment decisions after the Settlement Agreement was executed. (*Id.* at 16-17).  The VA does not dispute that it is relevant and proper for the Court to consider certain facts which predate the Settlement Agreement, including that Plaintiff made a complaint with the VA's EEO office in 2020 which was settled following mediation.[11] (Docket No. 69 at 2).  Nevertheless, since Plaintiff affirmatively states that she is not asserting an independent cause of action based on pre-Settlement Agreement conduct, the Court will not address the substance of Defendant's arguments.  Accordingly, any independent claims predicated on pre-December 10, 2020 conduct are deemed withdrawn.

## B.  Discrimination

Courts review employment discrimination claims under Title VII pursuant to the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, a plaintiff must establish a *prima facie* case of discrimination. *See Jones v. Yonkers Pub. Sch.*, 326 F. Supp. 2d 536, 542 (S.D.N.Y. 2004).  If the plaintiff satisfies this *prima facie* burden, there is a presumption of unlawful discrimination. *Id.*  The burden then shifts to the employer "to articulate a legitimate, clear, specific and non-discriminatory reason" for the adverse employment action. *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995).  If the defendant satisfies this burden of articulation, the plaintiff bears the ultimate burden of showing that the employer's stated reason was merely pretext for discrimination. *See Jones*, 326 F. Supp.

---

[11] The VA maintains that it will move under Federal Rule of Evidence 403 to exclude certain pre-Settlement Agreement evidence from consideration at trial. (Docket No. 69 at 2).  This issue is not pertinent to this motion for summary judgment and will be considered by the Court on a motion *in limine. See Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 407 (S.D.N.Y. 2003) ("The purpose of a motion in limine is to allow the trial court to rule in advance on the admissibility and relevance of certain forecasted evidence.").

2d at 543; *see also Farmer v. Shake Shack Enters., LLC*, 19 Civ. 9425 (PAE), 2020 WL 4194860, at *6 (S.D.N.Y. July 21, 2020). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact . . . remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143 (internal quotations omitted).

### 1. *Prima Facie* Case of Discrimination

To establish a *prima facie* case of discrimination, Plaintiff must show: "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for the position [s]he held; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb*, 521 F.3d at 138. Plaintiff's burden in presenting a *prima facie* case is "not onerous," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), and is described as *de minimis*, *see, e.g.*, *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009).

For the purposes of summary judgment, the VA concedes the first two elements— Plaintiff belongs to a protected class and is qualified for both RN and NP positions. (Docket No. 53 at 20). As to the third element, Plaintiff alleges she suffered three adverse employment actions: (1) she was not selected for the NP position in the CLC, (2) she was constructively demoted when she accepted the RN position, and (3) the VA sent her the Notice of Indebtedness regarding her NNEI Scholarship. (Docket No. 70 at 17). The VA does not dispute that Plaintiff was not selected for the NP position in the CLC and was sent the Notice of Indebtedness. (Docket No. 53 at 25, 28). However, the VA disputes Plaintiff's allegation that she was constructively demoted when she accepted the RN position. (*Id.* at 22-25). Additionally, the VA argues that Plaintiff is unable to establish the fourth element, that any adverse employment action occurred under circumstances giving rise to an inference of discrimination. (*Id.*).

To demonstrate discriminatory intent for purposes of establishing her *prima facie* case, Plaintiff must adduce evidence supporting the inference that "discriminat[ion] was *one of the employer's motives*, even if the employer also had other, lawful motives that were causative in the employer's decision." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (emphasis in original). The necessary inference may be derived from direct or indirect evidence. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 82 (2d Cir. 2005). "Direct evidence of discrimination includes, most commonly, disparaging comments regarding a protected class." *Pease v. City of New York*, 19 Civ. 7693 (KPF), 2021 WL 2651400, at *11 (S.D.N.Y. June 28, 2021). "Indirect evidence includes evidence that similarly situated comparators outside of Plaintiff's protected class were treated more favorably than Plaintiff." *Id.* This requires Plaintiff to show that: (1) she was "similarly situated in all material respects to the individuals with whom [she] seeks to compare [herself];" (2) the comparator was "subject to the same performance evaluation and discipline standards;" and (3) the comparator engaged in comparable conduct. *Id.* (internal quotations omitted).

**a. Non-Selection for the NP Position in the CLC**

Plaintiff's argument that she was not selected for the NP position in the CLC due to discrimination is unavailing. Plaintiff alleges that Dr. Kunjukutty discriminated against her by extending her FPPE multiple times, and these extensions caused Dr. Dolamore not to select Plaintiff for the NP position. (Docket No. 70 at 17). In support of this assertion, Plaintiff claims that Dr. Dolamore stated he did not select her because of "her placement on the FPPE." (*Id.*). However, Dr. Dolamore testified at his deposition that Plaintiff was taken "out of contention for the position" because she had previously reported that she did not want to work in the urgent care unit, which would be required for the CLC position. (Docket No. 70-2 at 6:3-21). Plaintiff

does not dispute that she requested to be removed from the urgent care unit, but contends she requested this because she did not want to work for Dr. Sexton, not because she was uncomfortable with the work. (Pl. 56.1 Resp. ¶ 6).  Even if Plaintiff's request to be transferred out of the urgent care unit was misunderstood, such a misunderstanding does not constitute discriminatory animus. *See Heaphy v. Webster Cent. Sch. Dist.*, 761 F. Supp. 2d 89, 94 (W.D.N.Y. 2011), *aff'd*, 452 F. App'x 73 (2d Cir. 2012) (establishing that "even if [employment decisions are] misguided, ill-founded, or unnecessary, they do not violate Title VII in the absence of evidence of a discriminatory motive").

Dr. Dolamore testified that Plaintiff's FPPE "was another factor that played into the concerns that [he] had" about selecting Plaintiff for the NP role. (Docket No. 70-2 at 21:3-12). Plaintiff does not dispute that it was standard procedure for the VA to place a provider on an FPPE when a new role required a change in privileges, nor does Plaintiff allege that her initial placement on the FPPE in 2021 was discriminatory or retaliatory. (Pl. 56.1 Resp. ¶ 16).  Instead, Plaintiff asserts the FPPE was extended based on "trivial" concerns, such as "failing to recommend optional vaccinations to patients." (*Id.* ¶ 22).  Plaintiff's disagreement with the VA's assessment of her performance is not sufficient to raise a question of fact as to whether the extension of the FPPE was motivated by discriminatory animus. *See Heaphy*, 761 F. Supp. 2d at 94; *Brown v. Am. Golf Corp.*, 99 F. App'x 341, 343 (2d Cir. 2004) (holding that "being instructed to follow the requirements of the Performance Improvement Plan," such as an FPPE, is not discriminatory even if the employee disagrees with the employer's assessment). Additionally, Plaintiff does not proffer any similarly situated comparators outside of her protected class to demonstrate that similar "trivial" concerns did not result in others having their FPPE extended. *See Pease*, 2021 WL 2651400, at *11.

Further, Dr. Dolamore was unaware of Plaintiff's national origin when he made the decision not to select her for the NP position. (Pl. 56.1 Resp. ¶ 37). Moreover, the candidate Dr. Dolamore selected for the NP position was a well-qualified Black woman with extensive relevant experience. (*Id.* ¶ 36). That Dr. Dolamore chose a candidate of the same race and sex as Plaintiff for the position "undercuts Plaintiff's efforts to contend that there are disputed issues of material fact concerning her ability to prove a prima facie case of discrimination." *Betterson v. HSBC Bank, USA, N.A.*, 139 F. Supp. 3d 572, 587 (W.D.N.Y. 2015), *aff'd*, 661 F. App'x 87 (2d Cir. 2016); *see also Toussaint v. N.Y. Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 212-13 (S.D.N.Y.), *aff'd*, 706 F. App'x 44 (2d Cir. 2017) (collecting cases) ("A number of cases in the Second Circuit have recognized that a plaintiff alleging race discrimination cannot establish that he was terminated in circumstances giving rise to an inference of discrimination where the similarly situated comparators are of the same protected class."). Therefore, Plaintiff has not established that her non-selection for the NP position in the CLC gives rise to an inference of discriminatory intent.

**b. Constructive Discharge**

Plaintiff's claim that she was constructively discharged because her workplace had become intolerable as a result of discrimination also fails.[12] Constructive discharge occurs "when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chamblee v. Harris*

---

[12] Plaintiff uses the terms "constructive demotion" and "constructive discharge" interchangeably in her briefing. (*See, e.g.*, Docket No. 70 at 17-18). "The Second Circuit has never adopted the constructive demotion theory." *Dowling v. Prudential Ins. Co.*, No. 87 Civ. 2189 (JFK), 1988 WL 3418, at *2 (S.D.N.Y. Jan. 12, 1988). However, "[a] voluntary transfer can constitute an adverse employment action if it amounts to a constructive discharge." *Sebold v. City of Middletown*, Civ. No. 3:05–CV–1205(AHN), 2007 WL 2782527, at *13 (D. Conn. Sept. 21, 2007). Here, Plaintiff resigned her position before she began the RN role. (Pl. 56.1 Resp. ¶ 42). Therefore, the Court may properly apply the constructive discharge analysis to Plaintiff's claim. *See Krishnapillai v. Donahoe*, No. 09–CV–1022 (NGG)(SMG), 2013 WL 5423724, at *11 n.3 (E.D.N.Y. Sept. 26, 2013).

*& Harris. Inc.*, 154 F. Supp. 2d 670, 675 (S.D.N.Y. 2001). "Such a claim requires the employee to show both (1) that there is evidence of the employer's intent to create an 'intolerable' environment that forces the employee to resign, and (2) that the evidence shows that a reasonable person would have found the work conditions so intolerable that he 'would have felt compelled to resign.'" *Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 49 (2d Cir. 2014) (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 229-30 (2d Cir. 2004)).  Additionally, a plaintiff must establish that the circumstances constituting constructive discharge give rise to an inference of discrimination on the basis of her race, sex, or national origin. *See Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003).

The relevant inquiry for constructive discharge is whether the "working conditions at the time of [the] resignation were [] so intolerable that a reasonable person would have been forced to leave the job." *Morris v. Schroder Cap. Mgmt. Int'l*, No. 03 CV 10287 (GBD), 2005 WL 167608, at *4 (S.D.N.Y. Jan. 25, 2005), *aff'd*, 481 F.3d 86 (2d Cir. 2007).  Here, Plaintiff resigned her NP position and began working in the RN position in or around March 2022, (Pl. 56.1 Resp. ¶¶ 42-43), so the Court's analysis considers work conditions around and immediately prior to that date. *See Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 93 (N.D.N.Y. 2013) ("The constructive-discharge inquiry focuses on the working conditions preceding the employee's resignation.").  Plaintiff does not allege she was subject to direct discrimination, such as "disparaging comments regarding a protected class," at that time. *Pease*, 2021 WL 2651400, at *11.  Instead, Plaintiff argues there is indirect evidence that she was constructively discharged because similarly "situated comparators outside of [her] protected class were treated more favorably." *Id.*  Specifically, Plaintiff asserts that she was treated differently than other providers when she was required to renew her credentials twice in 2021,

while a Pakistani female provider changed positions and was not required to be recredentialed. (Pl. Tr. 9:9-12:9; Docket No. 69 at 6).

Plaintiff does not cite case law establishing that having to be re-credentialed constitutes "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). Moreover, Plaintiff has not set forth facts demonstrating that she was "similarly situated in all material respects" to the Pakistani female provider or that they were engaged in comparable conduct. *Pease*, 2021 WL 2651400, at *11. Plaintiff simply states that the other provider "was not credentialed again when she moved back to the CLC." (Pl. Tr. 12:3-9). There is no evidence in the record that the other provider had a similar change in privileges, what prior privileges the other provider had, or other information sufficient to establish that the other provider qualifies as a similarly situated comparator for purposes of proving discrimination.

Plaintiff also alleges the following facts in support of her claim that she was constructively discharged: (1) Dr. Kunjukutty subjected Plaintiff's work to additional scrutiny; (2) Ms. Wallin reviewed Plaintiff's notes; (3) Dr. Kunjukutty extended Plaintiff's FPPE; (4) Dr. Kunjukutty told Plaintiff if she did not complete her FPPE she could lose her position; and (5) Dr. Kunjukutty told Plaintiff to file an EEO complaint if she thought she was being discriminated against.[13] (Docket No. 70 at 20). An employee being subject to allegedly excessive criticism and

---

[13] Plaintiff also contends that several examples of conduct prior to the Settlement Agreement demonstrate she was subject to an intolerable work atmosphere, including Dr. Kunjukutty following her to the bathroom, mimicking her accent, and making her feel uncomfortable. (Docket No. 70 at 19). These infrequent incidents, which occurred nearly two years before Plaintiff accepted the RN position, are insufficient to independently demonstrate that Plaintiff was constructively discharged or demoted. "[S]poradic, isolated incidents of 'boorish or offensive use of language' are insufficient to establish a hostile work environment." *Zucco v. Auto Zone, Inc.*, 800 F. Supp. 2d 473, 476 (W.D.N.Y. 2011) (quoting *Benette v. Cinemark U.S.A., Inc.*, 295 F. Supp. 2d 243, 251 (W.D.N.Y. 2003)). Additionally, a significant amount of time passed between these incidents and when Plaintiff accepted the RN position, during which Plaintiff requested and was placed in several different positions. (Pl. 56.1 Resp. ¶¶ 11-14, 26). Courts "disfavor[] constructive discharge claims where plaintiffs have remained on the job for more than a brief time." *Garrett v. Mazza*, No. 97 Civ. 9148 (BSJ), 2005 WL 2094955, at *5 (S.D.N.Y. Aug. 30, 2005); *see also*

other administrative inconveniences does not rise to the level of constructive discharge. *See*

*Nakis v. Potter*, No. 01 Civ. 10047 (HBP), 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004).

"[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety,

such intangible consequences are not materially adverse alterations of employment conditions."

*Castro v. N.Y.C. Bd. of Educ. Pers.*, No. 96 Civ. 6314 (MBM), 1998 WL 108004, at *7

(S.D.N.Y. Mar. 12, 1998).

Plaintiff alleges the circumstances she encountered are similar to those in *Dortz v. City of*

*New York*, where the court denied summary judgment on a constructive discharge claim. 904 F.

Supp. 127, 161 (S.D.N.Y. 1995).  However, in *Dortz*, the plaintiff's supervisor made "at least

eleven offensive comments [toward the plaintiff] in the course of approximately one month,"

including that the plaintiff was "queer, asexual, [and] needs a good fucking" and she was a

"frustrated bitch social work supervisor, who had better shape up or else," as well as stating that

his relationship with the plaintiff "could develop into a sado-masochistic relationship." *Id.* at

149.  Plaintiff's allegations here are not analogous.

Incidents Plaintiff cites, considered individually or cumulatively, fail to constitute

working conditions so intolerable that when "viewed as a whole, they are so difficult or

unpleasant that a reasonable person in the employee's shoes would have felt compelled to

resign." *Stroud v. New York City*, 374 F. Supp. 2d 341, 350 (S.D.N.Y. 2005) (quoting *Petrosino*

*v. Bell Atl.*, 385 F.3d 210, 230 (2d Cir. 2004)).  Therefore, Plaintiff has not established that she

was constructively discharged.  Furthermore, even if Plaintiff had shown that she was

constructively discharged, she has not demonstrated that those circumstances give rise to an

---

*Murdaugh v. City of N.Y.*, No. 10 Civ. 7218 (HB), 2011 WL 798844, at *6 (S.D.N.Y. Mar. 8, 2011) ("a significant passage of time where the employee endured the conditions complained of is sufficient to undermine a claim that working conditions were intolerable").

inference of discrimination on the basis of her race, sex, or national origin. *See Ashcroft*, 336 F.3d at 152.

### c. Notice of Indebtedness

Plaintiff has also not demonstrated that the VA sent her a Notice of Indebtedness under circumstances which give rise to an inference of discrimination. Plaintiff does not dispute that NNEI scholarships such as Plaintiff's are routinely audited once per year. (Pl. 56.1 Resp. ¶ 49). Nor does Plaintiff dispute that Dr. Kunjukutty had no involvement in "triggering" the audit or in determining whether Plaintiff breached her Scholarship Agreement.[14] (*Id.* ¶ 54). Further, Plaintiff does not assert that the interim coordinator who reviewed her Scholarship Agreement or the coordinator who issued the Notice of Indebtedness did so with "discriminatory intent," *Holcomb*, 521 F.3d at 138, or even were aware of Plaintiff's national origin. Therefore, Plaintiff has not sufficiently alleged that the VA issued her a Notice of Indebtedness under circumstances giving rise to an inference of discriminatory intent.

Accordingly, Plaintiff has failed to establish a *prima facie* case of discrimination under Title VII.

### 2. Legitimate, Non-Discriminatory Reason

Assuming, *arguendo*, that Plaintiff established a *prima facie* case of discrimination, the burden shifts to the VA to articulate a legitimate, non-discriminatory reason for the alleged adverse employment actions Plaintiff suffered. *See Holcomb*, 521 F.3d at 138. At this stage, the "defendant must clearly set forth, through the introduction of admissible evidence, reasons for its

---

[14] Plaintiff's memorandum of law states that "Dr. Kunjukutty was involved in the Agency's determination that Oghide was in breach of her scholarship agreement and ultimately in the decision to issue the Notice of Indebtedness." (Docket No. 70 at 23). However, the record is devoid of any evidence that supports this statement. In fact, Dr. Kunjukutty denies any involvement in the determination. (Docket No. 55 ¶ 21). The only evidence in the record relating to Dr. Kunjukutty's "involvement" was an e-mail sent to him on October 6, 2022 from the coordinator regarding Plaintiff's alleged breach. (Docket No. 70-39). Nothing in this e-mail suggests that Dr. Kunjukutty participated in the audit or influenced the Notice of Indebtedness.

actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotations omitted) (emphasis in original).  The burden on the VA is one of articulation. *See Fisher v. Vassar Coll.*, 114 F.3d 1332, 1336 (2d Cir. 1997).  "[T]he defendant need not persuade the court that it was actually motivated by its proffered reasons." *Id.*

The VA asserts that it had legitimate reasons for not selecting Plaintiff for the NP position in the CLC, accepting her resignation and transfer to the RN position, and issuing the Notice of Indebtedness. (Docket No. 53 at 18).  Specifically, the VA maintains that Plaintiff was not selected because she requested to transfer out of the urgent care unit and had previously expressed that she was uncomfortable handling cardiac and pulmonary emergencies. (*Id.* at 28).  Additionally, the VA argues that Plaintiff voluntarily resigned from her NP position in an e-mail stating that the resignation was her "sole decision" and a "willing decision." (*Id.* at 22).  The VA also contends that the Notice of Indebtedness was sent after routine reviews determined that Plaintiff was in breach of the terms of the Scholarship Agreement. (*Id.* at 25).  In response, Plaintiff contends that the VA mistook her reasons for requesting a transfer from the urgent care unit, she only requested to transfer to the RN position because her working environment had become intolerable, and she was in compliance with the terms of her Scholarship Agreement. (Docket No. 70 at 16-17, 23).

To satisfy its burden under the second step of the *McDonnell Douglas* framework, the VA need not prove at this stage that its legitimate, non-discriminatory reason for not hiring Plaintiff was accurate or correct—it is sufficient to merely articulate such a reason. *See St. Mary's Honor Ctr.*, 509 U.S. at 509 ("[b]y producing evidence (whether ultimately persuasive or not) of nondiscriminatory reasons, petitioners sustained their burden of production[.] . . . For the

burden-of-production determination necessarily *precedes* the credibility-assessment stage")

(emphasis in original); *Szuszkiewicz v. JPMorgan Chase Bank*, 257 F. Supp. 3d 319, 326

(E.D.N.Y. 2017) ("At this stage, the employer need only articulate—but need not prove—the

existence of a nondiscriminatory reason for its decision.").  The VA has articulated legitimate,

non-discriminatory reasons for the alleged adverse employment actions suffered by Plaintiff. *See*

*Tex. Dep't of Cmty. Affs.*, 450 U.S. at 259 (holding that an "employer has discretion to choose

among equally qualified candidates, provided the decision is not based upon unlawful criteria");

*Chanval Pellier v. Brit. Airways, Plc.*, No. Civ.A. 02-CV-4195, 2006 WL 132073, at *6

(E.D.N.Y. Jan. 17, 2006) (holding that if an employee's transfer "was voluntary," there was no

constructive discharge).  Accordingly, the VA has satisfied its burden under the second step of

*McDonnell Douglas*.

**3.  Evidence of Pretext**

If a defendant has proffered a legitimate, non-discriminatory reason for the alleged

adverse employment actions, the burden shifts back to the plaintiff to offer evidence that would

allow a rational juror to conclude that the purported reason for the adverse employment actions is

pretext for discrimination. *See St. Mary's Honor Ctr.*, 509 U.S. at 507-08.  "To show pretext, a

plaintiff must submit admissible evidence showing circumstances to permit a rational finder of

fact to find that the defendant's conduct was motivated in whole or in part by discrimination."

*Daly v. Westchester Cnty. Bd. of Legislators*, 19-CV-04642 (PMH), 2023 WL 4896801, at *6

(S.D.N.Y. Aug. 1, 2023) (quotation omitted).  The evidence offered must "go beyond self-

serving and conclusory allegations that the defendants' proffered reasons were false." *Id.*  Falsity

itself is not enough; the plaintiff must prove both that the reason was false and "that

discrimination was the real reason." *Messinger v. JPMorgan Chase Bank, N.A.*, 126 F. Supp. 3d 376, 385 (S.D.N.Y. 2015).

Here, Plaintiff alleges that the VA's explanations for not selecting Plaintiff for the NP position in the CLC, accepting her resignation and transfer to the RN position, and issuing the Notice of Indebtedness are merely pretextual. (Docket No. 70 at 24).  In support of her argument, Plaintiff alleges that Dr. Kunjukutty interfered with her FPPE by changing her evaluator and using trivial reasons to extend her FPPE. (*Id.* at 21-25).  However, Plaintiff does not offer any evidence, beyond her own statements, to suggest that Dr. Kunjukutty's stated reasons were insufficient to extend Plaintiff's FPPE and the real reason was discrimination.  "Plaintiff's own self-serving statements . . . are simply insufficient to overcome her burden of proof to survive summary judgment, as they are all self-serving statements uncorroborated by any additional evidence." *Hawkins v. N.Y. State Off. of Mental Health*, Case No. 17-CV-649 (NSR), 2019 WL 4520801, at *12 (S.D.N.Y. Sept. 19, 2019), *aff'd*, 845 F. App'x 9 (2d Cir. 2021); *see also Orisek v. Am. Inst. of Aeronautics & Astronautics*, 938 F. Supp. 185, 191 (S.D.N.Y. 1996) (finding that a plaintiff's "own disagreement with her employer's perceptions of her job performance does not satisfy her burden of showing that the [defendant's] proffered justification was a pretext for discrimination"), *aff'd*, 162 F.3d 1148 (2d Cir. 1998).

While Plaintiff correctly contends that it is undisputed that her work performance was previously rated satisfactory or above throughout her tenure, the change in her reviews beginning with her transfer do not alone demonstrate pretext.  "The mere fact of past satisfactory performance, followed by negative feedback, is not suggestive of impermissible animus." *Missick v. City of N.Y.*, 707 F. Supp. 2d 336, 350 (E.D.N.Y. 2010).

In addition, Plaintiff asserts that the issuance of the Notice of Indebtedness was pretextual because the terms of her Scholarship Agreement require that she maintain a "0610" nursing position. (Docket No. 70 at 24). Her RN position was a "0610" nursing position, so Plaintiff argues she did not violate the terms of the Scholarship Agreement. (*Id.*). This argument is unavailing because even if Plaintiff's interpretation is correct, she has not demonstrated that a mistake on the part of the scholarship coordinator was motivated by discriminatory intent. *See Warren v. N. Shore Univ. Hosp. at Forest Hills*, Civil Action No. CV-03-0019 (DGT)(RML), 2006 WL 2844259, at *9 (E.D.N.Y. Sept. 29, 2006), *aff'd*, 268 F. App'x 95 (2d Cir. 2008) ("Even if the information he received about plaintiff was wrong, it does not, without more, create an inference of pretext. An inaccurate, but honestly held belief about an employee does not establish a claim of pretext."); *see also Droutman v. N.Y. Blood Ctr., Inc.*, No. 03–CV–5384 (DRH/ARL), 2005 WL 1796120, at *9 (E.D.N.Y. July 27, 2005) ( "[T]he fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination.").

In sum, Plaintiff has failed to set forth admissible evidence demonstrating that the VA engaged in discrimination against her or that any of the VA's reasons for allegedly taking adverse employment actions against her were pretextual. Accordingly, Defendant's motion for summary judgment on Plaintiff's claim of discrimination based on race, sex and national origin under Title VII is granted.[15]

---

[15] Defendant also argues that Plaintiff's discrimination and retaliation claims relating to the VA extending her FPPE are untimely because Plaintiff did not timely exhaust her administrative remedies. (Docket No. 53 at 18). *See also* 29 C.F.R. § 1614.105(a); *Briones v. Runyon*, 101 F.3d 287, 289 (2d Cir. 1996). However, Plaintiff clarified in her opposition that she was not raising claims predicated on the VA extending her FPPE. (Docket No. 70 at 16). In addition, Plaintiff did not substantively address this claim in her brief opposing Defendant's motion for summary judgment. Thus, the Court considers any such claim withdrawn. *See Lami v. Stahl*, No. 3:05 CV 1416 (MRK), 2007 WL 3124834, at *1 (D. Conn. Oct. 25, 2007) ("It is well settled that a failure to brief an issue is grounds to deem the claim abandoned."); *Desiderio v. Celebrity Cruise Lines, Inc.*, No. 97 Civ. 5185 (AJP), 1999 WL 440775, at *3 (S.D.N.Y. June 28, 1999) (collecting cases).

## C. Retaliation[16]

Title VII forbids retaliation against an employee "because he [or she] has opposed any practice made an unlawful employment practice . . . or because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the auspices of the statute. 42 U.S.C. § 2000e-3(a). Retaliation claims under Title VII are analyzed under the same three-step burden-shifting framework as discrimination claims. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 208-09 (2d Cir. 1990). Once the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a non-retaliatory reason for the adverse employment action. *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015). "If the defendant provides such an explanation, the presumption of retaliation dissipates . . . and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (internal citations and quotation marks omitted). "An employee demonstrates 'but for' causation by proving that 'the adverse action would not have occurred in the absence of the retaliatory motive.'" *Murphy v. City of Newburgh*, 785 F. App'x 900, 902 (2d Cir. 2019) (quoting *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

## 1. *Prima Facie* Case of Retaliation

There are four elements that Plaintiff must demonstrate to establish a *prima facie* case of retaliation under Title VII: (1) Plaintiff engaged in a protected activity under Title VII; (2) the VA was aware of that activity; (3) the VA took adverse action against Plaintiff; and (4) there is a

---

[16] Although, "it remains an open question whether Title VII's prohibition on retaliation extends to protect federal employees," *Krul v. DeJoy*, 705 F. Supp. 3d 5, 58 (N.D.N.Y. 2023), *appeal dismissed* 24-314 (2d Cir. June 3, 2024), "[i]t is common in these cases for the federal government, as the defendant-employer, to concede that Title VII prohibits retaliation," *Huff v. Buttigieg*, 42 F.4th 638, 645 (7th Cir. 2022). Here, the VA does not contest that Title VII applies to Plaintiff's retaliation claim in this case insofar as Plaintiff alleges she was subject to "personnel actions" within the purview of 42 U.S.C. § 2000e-16(a). (Docket No. 53 at 26).

causal connection between the protected activity and the adverse action. *See Sumner*, 899 F.2d at 208-09. Causal connection, the final element of a *prima facie* retaliation claim, "can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Littlejohn v. City of N.Y.*, 795 F.3d 297, 319 (2d Cir. 2015) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). "[W]hen a plaintiff relies on temporal proximity alone to establish causation, courts 'uniformly hold that the temporal proximity must be very close,' which usually means less than three or four months." *Gehlaut v. New York City Dep't of Educ.*, No. 24-1741, 2025 WL 2586770, at *2 (2d Cir. Sept. 8, 2025) (summary order) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

For the purposes of summary judgment, the VA does not dispute the first two elements–Plaintiff engaged in protected activity and the VA was aware of it. (Docket No. 53 at 26). Rather, the VA argues Plaintiff is unable to establish a causal connection between her protected activity and the adverse employment actions she alleges.[17] (*Id.*). In response, Plaintiff asserts that "[b]ut for [her] EEO complaint, Dr. Kunjukutty would not have orchestrated the extended FPPE, would not have interfered with the CLC selection process by explicitly referencing her

---

[17] As discussed, *supra* Section III.B, Plaintiff alleges three adverse employment actions: (1) she was not selected for the NP position in the CLC, (2) she was constructively demoted when she accepted the RN position, and (3) the VA sent her the Notice of Indebtedness regarding her scholarship. (Docket No. 70 at 17). The VA does not dispute that Plaintiff was not selected for the NP position in the CLC and was sent the Notice of Indebtedness. (Docket No. 53 at 25, 28). However, the VA disputes Plaintiff's allegation that she was constructively demoted when she accepted the RN position. (*Id.* at 22-25).

protected activity, and would not have been involved in the scholarship breach determination."[18]

(Docket No. 70 at 25).

### a. Non-Selection for the NP Position in the CLC

Plaintiff engaged in protected activity when she filed her first complaint with the VA's EEO office around November 2020 alleging that Dr. Kunjukutty had discriminated and retaliated against her. (Pl. 56.1 Resp. ¶ 4). In December 2021, Plaintiff interviewed for the NP position in the CLC. (*Id.* ¶ 27). After Plaintiff learned that she was not selected for the position, she contacted the VA's EEO office again around March 2022. (*Id.* ¶¶ 55-57). Plaintiff asserts that a "factfinder can infer retaliatory animus from Dr. Kunjukutty's direct interference with the CLC selection process." (Docket No. 70 at 25). The VA argues that there is no temporal nexus because Plaintiff was not selected for the position more than a year after the first EEO complaint settled and before Plaintiff's second EEO complaint was filed. (Docket No. 53 at 27).

The Court agrees that a one-year lapse in time is typically insufficient to demonstrate a causal nexus for retaliation under Title VII. *See Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (holding that a three-and-a-half-month period between the complaint and the adverse action was insufficient to show a "causal nexus"). "However, it is only '[w]hen a party relies on the *mere* temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . that the temporal proximity must be very close.'"

---

[18] Plaintiff also briefly asserts that "forcing [her] to work as a COVID tester, a position filled by clerical staff, while threatening that she would 'need to resign' if she refused constitutes retaliation." (Docket No. 70 at 6). Even accepting Plaintiff's conclusory argument as true, "temporary reassignments which do not impact an employee's salary or benefits do not constitute an adverse employment action." *Freeman v. Dep't of Env't Prot.*, No. 10 CV 1555 (NGG)(LB), 2013 WL 817221, at *5 (E.D.N.Y. Feb. 5, 2013), *report and recommendation adopted*, 2013 WL 801684 (E.D.N.Y. Mar. 5, 2013); *see also Blake v. Developmental Servs.*, 278 F. Supp. 3d 519, 530 (D. Conn. 2017), *aff'd*, 750 F. App'x 54 (2d Cir. 2019) ("temporary transfer made pursuant to a standard procedure with no change in the Plaintiff's shifts, duties, title or pay cannot be an adverse action even for purposes of a retaliation claim"). Therefore, Plaintiff cannot make out a *prima face* case of retaliation based on her temporary assignment to the COVID unit since it did not negatively affect her salary, benefits, or NNEI Scholarship.

*Buchanan v. City of New York*, 556 F. Supp. 3d 346, 361 (S.D.N.Y. 2021) (alteration and emphasis in original) (quoting *Raymond v. City of New York*, 317 F. Supp. 3d 746, 773–74 (S.D.N.Y. 2018)).  A causal nexus may still be found where there are "numerous direct and circumstantial indicia of a causal link between" Plaintiff's protected activity and an adverse employment action. *Id.*

Dr. Kunjukutty stated in his declaration that while discussing Plaintiff's application for the NP role in the CLC, he told Dr. Dolamore that Plaintiff's transfer out of the urgent care unit "had been required by a settlement agreement that she entered with the VA." (Docket No. 55 ¶ 20).  Dr. Kunjukutty explained that he shared this information with Dr. Dolamore because he "believed that this was important information for him to be aware of." (*Id.*)  While Dr. Dolamore acknowledges that he learned about Plaintiff's first EEO complaint while considering Plaintiff's application for the NP position in the CLC, he cites many other factors that he considered when deciding not to offer Plaintiff the position. (Docket No. 56 ¶¶ 7-10).  Nevertheless, it is possible that a rational factfinder could find that Dr. Kunjukutty acted out of retaliatory animus when he told Dr. Dolamore that Plaintiff had previously filed an EEO complaint against him while Dr. Dolamore was discussing Plaintiff's candidacy for the NP position in the CLC.  This alone is sufficient for Plaintiff to make out a *prima facie* case because even if Dr. Dolamore had no retaliatory motive himself, he could have "been manipulated by [Dr. Kunjukutty] who does have such motive and intended to bring about the adverse employment action." *McDonough v. New York City Dep't of Educ.*, No. 16-CV-04272-LTS-JLC, 2018 WL 4636834, at *5 (S.D.N.Y. Sept. 27, 2018) (quoting *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016)); *see also Emanuel v. Gap, Inc.*, 19-CV-03617 (PMH), 2023 WL 5211007, at *12 (S.D.N.Y. Aug. 14, 2023) ("the unlawful motive of a non-decision maker is imputed to the

decision maker, and employer, where the non-decision maker has some significant influence that leads to the adverse employment action") (quoting *Vasquez*, 835 F.3d at 272). Moreover, it is possible that a rational factfinder could find that Dr. Dolamore did not select Plaintiff for the NP position because she previously filed an EEO complaint. Therefore, Plaintiff has made out a *prima facie* case for retaliation with respect to her claim that she was not selected for the NP position in the CLC because she engaged in protected activity.

**b. Constructive Discharge**

Plaintiff settled the first EEO complaint in December 2020. (Pl. 56.1 Resp. ¶ 7). Dr. Kunjukutty first extended Plaintiff's FPPE in March 2021, (*id.* ¶ 22), three months later, thus beginning the alleged campaign of retaliation that culminated in her constructive discharge.[19]

Temporal proximity alone can establish causal connection as long as the temporal proximity is generally "less than three or four months." *Gehlaut*, 2025 WL 2586770, at *2; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010) ("Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action."). However, as discussed, *supra* Section III.B.1.b, Plaintiff has not established that her working conditions, considered individually or cumulatively, were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Stroud*, 374 F. Supp. 2d at 350 (internal citation omitted). Therefore, Plaintiff has not established that she was constructively discharged or demoted, and thus, she has not made a *prima facie* case of retaliation on her constructive discharge claim.

---

[19] *See supra* n.12.

### c. Notice of Indebtedness

Finally, Plaintiff alleges that she was retaliated against when the VA issued her the Notice of Indebtedness. (Docket No. 70 at 26). However, Plaintiff does not proffer any further explanation as to how the Notice of Indebtedness was motivated by retaliatory intent. Rather, Plaintiff conclusorily states that "Dr. Kunjukutty was involved in the decision to issue a Notice of Indebtedness demanding nearly $40,000 for a 'breach' that only occurred because the [VA]'s retaliatory conduct forced [Plaintiff] from her nurse practitioner position." (*Id.*). However, even Plaintiff's own admissions belie this assertion, as she does not dispute that "Dr. Kunjukutty had no involvement in triggering the review of Plaintiff's employment for compliance with her scholarship agreement or in determining whether Plaintiff breached the agreement." (Pl. 56.1 Resp. ¶ 54). Moreover, Plaintiff does not allege that the Notice of Indebtedness was sent due to retaliatory animus or that the reviewers of her Scholarship Agreement were aware of her protected activities.[20]

Additionally, the Notice of Indebtedness was sent in March 2023, approximately one year after Plaintiff accepted the RN position and more than two years after she filed her EEO complaint. (Pl. 56.1 Resp. ¶¶ 43, 53, 55). Thus, there is no temporal proximity between any of Plaintiff's protected activities and the Notice of Indebtedness. *See Meyer*, 722 F. App'x at 28. Accordingly, Plaintiff has not established a *prima facie* case of retaliation as to the Notice of Indebtedness.

### 2. Legitimate, Non-Discriminatory Reasons

Because Plaintiff has established a *prima facie* case of retaliation regarding her non-selection for the NP position in the CLC, the burden shifts to Defendant to produce evidence that

---

[20] *See supra* n.14.

its actions were taken for legitimate, non-retaliatory reasons. *See Casalino v. N.Y. State Cath. Health Plan, Inc.*, No. 09 Civ. 2583 (LAP), 2012 WL 1079943, at *10 (S.D.N.Y. Mar. 30, 2012). "This 'burden of showing a legitimate[,] non-[retaliatory] reason for its actions is not a particularly steep hurdle,'" *Terpstra v. Shoprite Supermarket, Inc.*, No. 17-CV-6840 (KMK), 2019 WL 3338267, at *6 (S.D.N.Y. July 25, 2019) (internal citation omitted), and "is 'one of production, not persuasion,'" *Dodd v. City Univ. N.Y.*, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020) (quoting *Reeves*, 530 U.S. at 142).

Dr. Dolamore cites several factors that he considered when deciding not to offer Plaintiff the NP position in the CLC, including: (1) Plaintiff "had previously expressed that she was uncomfortable handling cardiac and pulmonary emergencies," (Docket No. 56 ¶ 7); (2) "Dr. Hall had concerns regarding whether it was safe for [Plaintiff] to practice in the urgent care facility based on his assessment of the medical care she provided when she was previously working there," (*id.*); (3) Plaintiff "had expressly requested to be removed from her position working in urgent care," (*id.*); and, (4) when Dr. Dolamore previously worked with Plaintiff, he "instructed [Plaintiff] to write a specific order for a patient, and she refused to do so," (*id.* ¶ 9). Therefore, the VA has met its burden to articulate a legitimate, non-retaliatory reason for not selecting Plaintiff for the NP position.

### 3. Evidence of Pretext

Since the VA has proffered legitimate, non-retaliatory reasons for its actions, the burden shifts back to Plaintiff to produce "evidence that the defendant's proffered, non-[retaliatory] reason is a mere pretext for actual [retaliation]." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S.

338, 352 (2013).  To defeat summary judgment, "a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations." *Zann Kwan*, 737 F.3d at 847.

Here, Plaintiff asserts the VA's reasons for not selecting her for the NP position are merely pretextual because she consistently received positive performance reviews and never said she was uncomfortable providing care in the urgent care unit. (Docket No. 70 at 21-22, 24-26). However, the record shows that Dr. Sexton sincerely believed Plaintiff said "she is not comfortable taking care of any Veteran with complaints of Che[s]t Pain, or [shortness of breath]." (Docket No. 55-1).  To the extent that Dr. Sexton's understanding was inaccurate, that does not establish pretext, since an employer may not select an applicant for an open position "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *DeLuca v. Allied Domecq Quick Serv. Restaurants*, No. 03-CV-5142 (JFB)(AKT), 2006 WL 1662611, at *9 (E.D.N.Y. June 13, 2006) (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)). Therefore, Plaintiff has not demonstrated that these reasons were merely pretextual.

Nevertheless, the VA has not set forth a rationale as to why Dr. Kunjukutty "believed that [it] was important information for [Dr. Dolamore] to be aware" that Plaintiff's transfer out of the urgent care unit "had been required by a settlement agreement that she entered with the VA." (Docket No. 55 ¶ 20).  Additionally, Dr. Dolamore has offered several, somewhat inconsistent explanations for why Plaintiff was ultimately not selected for the NP position.  In response to Plaintiff's second EEO complaint, on October 17, 2022, Dr. Dolamore stated that after Plaintiff's interview for the NP position in the CLC, he "confirmed" that Plaintiff "was unable to cover the urgent care as a result of her prior EEO, which excluded her from consideration for the position."

(Docket No. 70-50 at 4).  In that statement, he failed to mention any other alleged reasons for not hiring her for the positions.  In his November 22, 2024 deposition, Dr. Dolamore testified that Plaintiff's prior request to be transferred out of the urgent care unit, as well as Drs. Hall and Kunjukutty concerns that Plaintiff was "not safe to practice medicine in the urgent care [unit]," "took [Plaintiff] out of contention for the [NP] position." (Docket No. 70-2 at 30:3-21).  Later, in his June 14, 2025 declaration in support of the instant motion, Dr. Dolamore added that he had "concerns regarding [Plaintiff's] ability to follow a supervisor's instructions based on a prior interaction that [he] had with her several years earlier. . . . [when he] instructed [Plaintiff] to write a specific order for a patient, and she refused to do so." (Docket No. 56 ¶ 9).

"A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan*, 737 F.3d at 846 (collecting cases).  The inconsistencies in Dr. Dolamore's explanation are sufficient to defeat summary judgment because a reasonable juror could find that Defendant's stated reasons were merely pretextual and that "but for" her filing an EEO complaint he would have hired Plaintiff for the NP position.

Accordingly, Defendant's motion for summary judgment on Plaintiff's retaliation claim is denied.

## D.  Hostile Work Environment Based on Race and National Origin

To make out a claim of hostile work environment, Plaintiff must point to evidence in the record indicating that the "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment

and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Specifically, Plaintiff must adduce evidence that the complained of conduct "(1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [race, sex, or national origin]." *Figueroa v. Johnson*, 109 F. Supp. 3d 532, 552-53 (E.D.N.Y. 2015) (quoting *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 233 (E.D.N.Y. 2014)).  Additionally, a plaintiff must establish a specific basis for imputing the hostile work environment to the employer. *See Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 658-59 (S.D.N.Y. 2017).

"Whether the challenged conduct is sufficiently severe or pervasive 'depends on the totality of the circumstances.'" *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)).  In *Harris*, the Supreme Court established a non-exclusive list of factors to consider including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 510 U.S. at 23.  The analysis principally focuses on the frequency and the severity of the misconduct; the last three factors are specific considerations within the severity inquiry. *Aulicino*, 580 F.3d at 82.  The effect of the identified incidents on a plaintiff's well-being, though not dispositive, are also relevant. *Harris*, 510 U.S. at 23.  Moreover, it is well settled that even a single act can create a hostile work environment if, by itself, it transforms the plaintiff's workplace, and is "extraordinarily severe." *Cruz*, 202 F.3d at 570; *see also Marmol v. Costco Wholesale Corp.*, 364 F.3d 54, 59 (2d Cir. 2004).

Here, Plaintiff's hostile work environment claim is predicated on allegations that (1) Dr. Kunjukutty subjected Plaintiff's work to additional scrutiny; (2) Ms. Wallin reviewed Plaintiff's notes; (3) Dr. Kunjukutty extended Plaintiff's FPPE; (4) Dr. Kunjukutty told Plaintiff that if she did not complete her FPPE she could lose her position; and (5) Dr. Kunjukutty told Plaintiff to file an EEO complaint if she thought she was being discriminated against. (Docket No. 70 at 20).[21]  The VA disputes that these circumstances are objectively hostile or a result of Plaintiff's status as a member of a protected class. (Docket No. 53 at 30-32).

### 1. Objectively Hostile Work Environment

The Court assumes for purposes of the instant discussion that Plaintiff subjectively perceived her working environment as hostile. Nevertheless, Plaintiff has not adduced any evidence that could lead a reasonable fact finder to conclude that her work environment was objectively hostile.  "[P]etty slights or trivial inconveniences . . . are not actionable." *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 80 (1st Dep't 2009).

As an initial matter, it is not hostile or abusive that Plaintiff was assigned to COVID detail. (Docket No. 70 at 19).  First, Plaintiff agreed to assist with the COVID testing. (Pl. 56.1 Resp. ¶¶ 12-14).  Second, Plaintiff was only assigned to COVID detail for less than two months. (*Id.*). *See Ping Chow Wei v. Antehm Inc.*, Case No. 16-cv-0468 (SFJ)(AKT), 2018 WL 5622571, at *11 (E.D.N.Y. Sept. 4, 2018) (explaining that "temporary reassignment" is not an adverse employment action).  Additionally, although she felt harassed by her assignment to COVID

---

[21] In the Complaint, Plaintiff also supports her hostile work environment claim with additional facts, such as being denied leave requests, receiving a delayed release date, and being "forced . . . to work without lunch breaks and work long hours." (Docket No. 1 ¶ 83).  However, the Complaint does not explain how these circumstances were causally related to her race, sex, national origin, or protected activities.  Because Plaintiff's opposition does not address these additional circumstances, the Court considers any theories of hostile work environment based thereon abandoned. *See, e.g., Grandy v. Manhattan & Bronx Surface Transit Operating Auth.*, 16-CV-6278 (VEC), 2018 WL 4625768, at *10 n.18, n.24, n.44 (S.D.N.Y. Sept. 26, 2018) (explaining that theories of discrimination and retaliation which are alleged in the Complaint but not addressed in Plaintiff's opposition are deemed abandoned).

detail, (Docket No. 70 at 19), Plaintiff does not dispute that "[m]any clinicians assisted with COVID testing as a collateral function" and "there was a need for a full-time healthcare practitioner to oversee COVID testing for staff," (Pl. 56.1 Resp. ¶ 11).  Therefore, "this is not a case where Plaintiff was assigned to . . . perform inappropriately menial tasks and duties below her rank," so it is insufficient to establish a hostile work environment. *Bowen-Hooks*, 13 F. Supp. 3d at 214; *see also Jeffrey v. Montefiore Med. Ctr.*, No. 11 Civ. 6400 (RA), 2013 WL 5434635, at *19 (S.D.N.Y. Sept. 27, 2013) ("Plaintiff's assertion that she was assigned 'less meaningful tasks' . . . is precisely the sort of 'mere inconvenience or an alteration of job responsibilities' that cannot constitute an adverse action.").

It is also not hostile for an employee's work to be subject to additional scrutiny. *See Busby v. Syracuse City Sch. Dist.*, 5:15-CV-1007 (LEK/ATB), 2017 WL 1380573, at *6 (N.D.N.Y. Apr. 17, 2017), *aff'd*, 715 F. App'x 63 (2d Cir. 2018) ("job performance criticism does not create a hostile work environment").  Therefore, Plaintiff's argument that she was subject to a hostile work environment because Dr. Kunjukutty extended her FPPE based on what she perceived as "trivial" concerns in unavailing. (Pl. 56.1 Resp. ¶ 22). *See Waters v. Gen. Bd. of Glob. Ministries*, 769 F. Supp. 2d 545, 555 (S.D.N.Y. 2011) (explaining that plans for employee performance are not objectively hostile unless premised on discriminatory intent).  In addition, Plaintiff's disagreement with the VA's assessment of her performance does not raise a question of fact as to whether the extension of the FPPE was motivated by discriminatory animus. *See Heaphy*, 761 F. Supp. 2d at 94; *Brown*, 99 F. App'x at 343.  Although Plaintiff alleges it is noteworthy that Dr. Kunjukutty concluded her FPPE in February 2022 on the same day she told Drs. Kunjukutty and Saxena that she felt they were discriminating against her, Plaintiff does not explain how this timing is objectively hostile. (Docket No. 70 at 22).  Furthermore, Plaintiff

acknowledges that it was common practice for an employee to be placed on an FPPE when transferring units and modifying privileges. (Pl. 56.1 Resp. ¶ 16).  It would also not have been hostile or abusive for Plaintiff to have been placed on an FPPE for cause or to have her FPPE extended. *See Salerno v. Town of Bedford, NY*, No. 05 Civ. 7293 (SCR), 2008 WL 5101185, at *8 (S.D.N.Y. Dec. 3, 2008) ("Allegations of negative job evaluations or excessive reprimands are insufficient to establish a hostile environment claim.").

Additionally, Plaintiff does not dispute the accuracy of Dr. Kunjukutty's statement that if she did not complete her FPPE, the VA would be required to report her to relevant licensing boards and her credentials could be revoked. (Pl. 56.1 Resp. ¶ 19).  This statement was not hostile or abusive; it simply stated what could happen.  Further, having Ms. Wallin review Plaintiff's notes does not constitute a hostile work environment. (*Id.* ¶ 20). *See Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 120 (S.D.N.Y. 2022) (explaining that without a causal nexus to discrimination, "micromanagement" and being disciplined does not constitute a hostile work environment).

Finally, Plaintiff does not explain how Dr. Kunjukutty suggesting she file an EEO complaint against him if she thought she was being discriminated against constitutes a hostile work environment.[22] (Docket No. 70 at 20).  Thus, Plaintiff has not met her burden to demonstrate that her work environment was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21.

---

[22] Plaintiff did not cite any case law to support her assertion that Dr. Kunjukutty's suggestion that she file an EEO complaint constituted a hostile work environment, nor could the Court find any such cases in this Circuit.

- 39 -

## 2. Nexus Between Hostile Conduct and Plaintiff's Race, Sex, and National Origin

Assuming, *arguendo*, that Plaintiff had adduced evidence that her work environment was objectively hostile, she must also demonstrate that the conduct occurred because of her race, sex, or national origin. *See Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) (cautioning that it is "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.").

Here, Plaintiff alleges that Dr. Kunjukutty followed her to the bathroom, mimicked her accent, and made her feel uncomfortable in 2015 and 2016. (Pl. Tr. at 133:3-7).  These circumstances alone are insufficient to support Plaintiff's claim of a hostile work environment. *See Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("Isolated, minor acts or occasional episodes do not warrant relief.").  Plaintiff, however, argues that a fact finder can make the inference that the hostile conditions she experienced were casually connected to her race, sex, or national origin. (Docket No. 70 at 18-19).  Plaintiff's argument fails because she does not set forth facts to suggest that extending her FPPE, scrutinizing her work, or any of the other allegations against Defendant were because of her race, sex, or national origin. *See Brennan*, 192 F.3d at 318 ("A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class.").

Therefore, Plaintiff has not sufficiently established a nexus between her allegedly hostile work environment and her race, sex, or national origin, nor has she shown that the circumstances she alleges constituted a hostile work environment. *See Giscombe v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 464 (LTS)(KNF), 2013 WL 829127, at *6 (S.D.N.Y. Feb. 28, 2013) (dismissing a hostile work environment claim based on race and gender where the plaintiff did not plead "any facts that would establish a nexus between the incidents underlying his hostile workplace claim and

his race or gender"); *see also Richard v. N.Y.C. Dep't of Educ.*, 16-CV-957 (MKB), 2017 WL 1232498, at *14 (E.D.N.Y. Mar. 31, 2017) (collecting cases).  In sum, viewing the evidence in the light most favorable to Plaintiff, the Court finds that Defendant is entitled to summary judgment with respect to Plaintiff's hostile work environment claim. *See Figueroa*, 109 F. Supp. 3d at 552-53.[23]

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in part and denied in part.  Plaintiff's discrimination and hostile work environment claims are dismissed. Plaintiff's retaliation claim under Title VII remains.

The Clerk is respectfully requested to terminate the pending motion (Docket No. 52).

Dated:    March 31, 2026
          White Plains, New York

SO ORDERED:

JUDITH C. McCARTHY
United States Magistrate Judge

---

[23] The Court need not address whether the alleged hostile conduct can be imputed to the VA, *see Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 658-59 (S.D.N.Y. 2017), because Plaintiff does not establish a viable hostile work environment claim.